CLIFTON MCFARLAND v. THE STATE.

No. 18023.   Delivered April 21, 1937.

310

The opinion states the case.

*Thos. C. Ferguson,* of Burnet, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

HAWKINS, JUDGE.—Conviction is for assault with intent to murder a negro by the name of Stafford Sanders; punishment assessed being confinement in the penitentiary for a term of eighteen months.

The facts, condensed, may be stated as follows: Stafford Sanders (hereafter referred to as Stafford for convenience) lived on a place belonging to Rufus McFarland. The latter, with his family, and his father, Jack McFarland, lived some half mile from the house occupied by Stafford. Stafford had some dogs. McFarland either thought the dogs had been killing his sheep, or was apprehensive that they might do so, and talked to Stafford about it. Stafford claimed upon the trial that he had aided Rufus in watching the dogs to see if they were molesting the sheep, and had authorized the McFarlands to kill the dogs if they disturbed anything. On the other hand, it was the contention of appellant that Stafford had threatened to do violence to whoever might kill the dogs. Clifton McFarland (appellant here) and King McFarland, were brothers of Rufus, but did not live on the place. On the second of August, 1934, the McFarlands had planned a barbecue for their families and friends. Jack McFarland had promised to furnish a lamb to barbecue for the occasion. When they went into the pasture to get the lamb they discovered two sheep which had been

killed by dogs. The four McFarlands heretofore mentioned and a man by the name of Woods seem to have been together at this time. Woods was on a horse. The four McFarlands were in a car. After discovering the dead sheep the McFarlands went back to the house of Rufus and secured a 22 rifle and a shot gun, and then went to the home of Stafford. Rufus killed one of the dogs and appellant shot at another one. Stafford was not at home at the time, he and his son Nolan having been away several days working in Burnet. They were on the way home at the time. A neighbor by the name of Stewart had overtaken them in his car and had given them a ride until he reached a point where he turned off to transact some business, and they resumed their journey on foot. They crossed a small pasture and entered a field. The McFarlands were then at Stafford's house. When Stafford's wife saw them coming through the field she motioned them back. Stafford stopped but Nolan went on towards the house. Rufus and King McFarland came down into the field and met Nolan. The latter's testimony is that they threatened to kill him, each of them having a gun, and that they struck him with the guns, knocking him down more than once, then compelled him to go with them to a little lane leading from Stafford's house down where they were. It appears that appellant had driven the car from the house down to the point in the lane opposite where the two McFarlands mentioned had assaulted Nolan. Nolan says when they got to the car they opened the door and tried to make him get in the car, but he ran, and one of them shot at him. In the meantime Stafford turned back toward the road, but was overtaken by the car in which were the three McFarland boys and their father. Stafford's story about what occurred when they overtook him is substantially as follows: They came into the road in such way as to cut him off from going in either direction; three of the McFarland boys got out of the car. Rufus told Stafford he was going to kill him, and shot him in the jaw with the 22 rifle. Then all of them began beating him on the head with the guns. This appellant had a shot gun with which Stafford says appellant struck him several times. Just how long this encounter in the road lasted is uncertain from the evidence. Mr. Stewart, who had let the negroes out of his car some time before, came on down the road and reached the scene. He says that he saw one of the McFarland boys strike the negro with a gun. None of them struck him after Stewart got there, but both Rufus and this appellant were continually threatening to strike him, and Stewart got out of his car and

went from one to the other trying to prevent them from further assaulting the negro, who at this time seemed to be badly injured. After Stewart left the McFarlands loaded the negro in the car and went to Rufus McFarland's house and Rufus got out and got an oil can and said they were going to burn the negro, referring to Stafford. Rufus told a witness then present if they would go over there in the field they would find another dead negro. Officers finally got Stafford away from the McFarlands. He was taken in an ambulance to Breckenridge Hospital in Austin, being accompanied by Fred Craddock, who was at that time Relief Administrator for Burnet County. Stafford was unconscious at the time they left Burnet but regained consciousness on the way to Austin. When Stewart reached the scene of the disturbance one of the McFarlands (Stewart thought it was Rufus) told him Stafford was trying to kill him, or them. After having discovered the dead sheep as heretofore stated, the McFarlands went to Rufus' home to get guns. They left Jim Woods in the pasture trying out a horse which he contemplated purchasing. Woods claimed after the boys got down in the road he saw Stafford reach in the McFarland car, grab an axe and strike King McFarland on the shoulder, knocking him down, at which time Rufus McFarland fired at Stafford with the rifle. Woods claimed not to have seen anything further, but says he turned and rode away. Jack McFarland, the father, denied being at the scene of the assault, but said he remained at Stafford's house and was talking to Stafford's wife; that shortly after the boys left he heard a gun shot, but that he (Jack McFarland) walked back to his home. One witness testified that as the car approached this place after the assault one of the McFarlands was standing on the running board of the car, striking with a gun barrel at Stafford who was inside the car. During the assault on Stafford the stocks were broken from both guns, and the barrels were used as bludgeons to strike with.

Upon calling of the case for trial appellant presented his second application for continuance based upon the absence of Dr. David L. White. Appellant had never had process issued for said witness, but was relying upon process issued at the instance of the State. The bill of exception complaining of the action of the court in overruling the application for continuance shows that the indictment was returned on the 13th day of December, 1934. On the 14th day of December the State through its district attorney obtained process for Dr. White, showing his residence to be in Austin, Texas. The process was

served upon Dr. White, and when the case was called on the 18th of December, 1934, Dr. White was present in court ready to testify. The cause at that time was continued, and witnesses were instructed to return at the June term, 1935, of said court. Subsequent to the December, 1934, term of court Dr. White moved to the State of New York. Neither the district attorney nor appellant knew that said witness would not be present at the June term until a companion case was called for trial two days before the present case was called. As soon as it was discovered that Dr. White was then a resident of the State of New York appellant offered to prepare and file interrogatories and apply for commission to take the deposition of said witness as soon as the interrogatories could be crossed by the representative of the State. It was set up in said application that Stafford Sanders would claim that he was shot more than once; that if present Dr. White would testify that he had X-rayed Stafford at the hospital in Austin and found only one place where Stafford had been shot, and that the injuries to the head of prosecuting witness were caused wholly by being struck with some instrument. Stafford did testify upon the trial as follows:

"They (meaning the McFarland boys) shot me several times. I don't know exactly how many times they did shoot me, or who it was that did the shooting, but the man down at the hospital told me that they took one bullet out of here and one out of here."

We assume that witness indicated the places where the bullets were taken out, and he was not more specific than as indicated above. On cross-examination Stafford testified:

"I don't know just the kind of gun he (referring to Rufus McFarland) was using when he shot me. I think the bullet that hit me right along here is still in me. I said it appeared to me that he was shooting with a target. I don't know what kind of gun it was."

In view of the testimony of the prosecuting witness the materiality of Dr. White's testimony is obvious. The refusal of the continuance would be such error as would demand a reversal unless the doctor's testimony was supplied by that of Fred Craddock, the Relief Administrator. His testimony was in substance that he accompanied Stafford to the hospital and was present when the doctors made an examination of him, but that he did not see the doctors take any bullets from Stafford's body; that the doctor discussed the case with him at the time and told witness that he (the doctor) could not tell very much about Stafford's condition just then, but did not think it

very serious; that witness called the doctor the next day over the telephone and that the doctor said he thought Stafford was going to be all right, that he just had a good beating and that apparently he would be out of the hospital in about three days, and that they did in fact release him from the hospital in three days. We are inclined to believe that this testimony failed to supply the evidence expected from the witness White. It was purely hearsay. Stafford's testimony, if believed by the jury, was that he had been shot by the McFarlands a number of times in the encounter. Evidence was before the jury from which they might have concluded that in the beginning of the encounter Rufus McFarland had fired at Stafford in defense of his brother King McFarland, as against an assault upon him with an axe by Stafford. However, if the jury believed that during the continuance of the encounter the injured party had been again shot it might have influenced the jury in finding that appellant and his brothers intended to kill Stafford. At least, this would have strengthened such view much more than if only one shot had been fired, and the assault was continued by the use of the guns as bludgeons, and not to shoot with. Therefore, the conclusion is expressed that the court should have granted appellant's second application for continuance.

Bills three, four and five bring forward objections to witnesses testifying to acts and declarations of appellant and his companions after they had been told by a deputy sheriff to consider themselves under arrest. If the party telling them this was an officer they apparently refused to submit to the arrest, and continued their acts of violence and threats against the negro, proof of which was admissible. This question is considered at greater length in the opinion in No. 18,024, State of Texas v. Rufus McFarland, a companion case. (Page 315 of this volume.)

When Stewart reached the parties where the assault was committed Rufus McFarland told him that Stafford Sanders was trying to kill "him" or "them," and Woods testified that he saw Stafford grab an axe from the car and strike King McFarland with it, at which time Rufus McFarland fired at Stafford with a 22 rifle. The trial court charged on self-defense against an attack upon appellant himself, and also upon his right to defend against an attack upon appellant's companions. Appellant contends that under the facts he was entitled to have Art. 1223, P. C., given in charge to the jury. Said article reads as follows:

"When the homicide takes place to prevent murder, maim-

ing, disfiguring or castration, if the weapon or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury."

The court's attention was called to such omission by specific exception to the charge submitted for inspection. Supporting his proposition appellant cites us to Mason v. State, 88 Texas Crim. Rep., 642, 228 S. W., 952; Hawkins v. State, 32 S. W. (2d) 202; Miller v. State, 71 S. W., 516; Lowe v. State, 111 Texas Crim. Rep., 137, 12 S. W. (2d) 221; Pinkston v. State, 69 S. W. (2d) 60. The jury should have been told substantially that if Stafford Sanders was making an attack upon King McFarland with an axe, and was so using it that death or serious bodily injury might result to King McFarland it was to be presumed that he designed to inflict the injury. The refusal to so instruct was an error calling for reversal.

Bills sixteen and seventeen complain of argument of State's counsel as a reference to the failure of appellant to testify. The argument is a statement in substance that the State's evidence had not been denied. It was shown in the bills that appellant did not testify, that Rufus McFarland and King McFarland were under indictment for the same offense and could not testify, hence it is argued that the reference was of necessity to appellant's failure to take the witness stand. We have frequently called attention to the danger of this character of argument in view of the positive provision of the statute upon the subject. (Art. 710, C. C. P.) As the judgment must be reversed upon other grounds we do not further discuss the bills mentioned, but suggest that upon another trial such argument be omitted.

For the reasons heretofore stated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*